FILED
U.S. DISTRICT COURT
AUGUSTA DIV.
2019 MAR 11 AM 10:03
CLERK J. Hodge
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| RONALD A. NURSE, | * | |
| Plaintiff, | * | |
| v. | * | CV 117-108 |
| RHODES FINANCIAL SERVICES, INC., | * | |
| Defendant. | * | |

**O R D E R**

Before the Court is Defendant's motion for summary judgment. (Doc. 19.) Defendant's motion seeks dismissal of each of Plaintiff's remaining employment discrimination claims. For the reasons set forth below, Defendant's motion is **GRANTED**.

**I. BACKGROUND**

This employment discrimination case arises out of Plaintiff Ronald A. Nurse's brief employment with TaxSlayer Financial Services Group, LLC, which is owned and operated by Defendant Rhodes Financial Services, Inc. (Def.'s Statement of Material Facts ("Def.'s SOMF"), Doc. 19-1, ¶¶ 1, 3.)[1] Plaintiff, acting

---

[1] Plaintiff did not submit a statement of material facts with his response brief, as required by the Court's Local Rules. LR 56.1, SDGa. As a result, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted." Id. Instead, Plaintiff's response brief

*pro se*, filed a complaint alleging race, age, sex, and national origin discrimination and violation of his rights under the Eighth and Fourteenth Amendments. (Compl., Doc. 1, at 2.) The United States Magistrate Judge screened the complaint and sanctioned Plaintiff's race discrimination and retaliation claims while recommending dismissal of Plaintiff's age discrimination, sex discrimination, and constitutional claims. (Report and Recommendation, Doc. 5, at 4-5; Order of Dec. 6, 2017, Doc. 4, at 3.) The Court adopted that recommendation without objection from either party. (Order of Jan. 3, 2018, Doc. 8.)

## A. Plaintiff's Allegations of Discrimination

In October 2016, Plaintiff, an African-American man, was hired as a seasonal employee to work in Defendant's customer service department. (Dep. of Ronald A. Nurse ("Nurse Dep."), Doc. 19-2, at 39-42.) According to Plaintiff, he experienced multiple instances of discrimination against African-Americans during his employment. The complaint alleges black employees were forced to park their cars in a separate lot from other workers, Defendant refused to timely pay black employees, and Defendant's white

---

simply copies the allegations of his complaint and argues there is video evidence to support his allegations. (See Doc. 23.)

2

employees looked down on their black co-workers because of feelings of hatred and contempt. (Compl., at 3-4.)

Plaintiff further alleges that on November 28, 2016, he was harassed by two of his white co-workers. (Id. at 4.) Jacob McNeil referred to Plaintiff as his "slave" and another co-worker mimicked beating Plaintiff with a metal rod. (Id.) On November 30th, Candes "Candi" Spencer, one of Plaintiff's white supervisors, instructed Plaintiff to not sit next to her. (Id.) Plaintiff alleges Spencer was a known racist because she admonished female black employees for defecating on the toilets in the women's restroom. (Id.) Next, on December 2nd or 3rd, Will Smith, a white supervisor, reprimanded Plaintiff in front of other workers for visiting websites during work. (Id.) Plaintiff contends Smith was "nasty, rude, and condensing [sic]" and singled out Plaintiff despite multiple other employees also visiting websites. (Id.) This incident led Plaintiff to declare he quit and leave the building "to avoid a bad decision and violent altercation." (Id.; see also Nurse Dep., at 163, 188.) Plaintiff never returned to work after the incident with Smith. (Def.'s SOMF, ¶ 46.)

**B. Evidence Submitted with Summary Judgment Motion**

While Plaintiff's complaint levies multiple serious allegations of discrimination, his deposition testimony undermines many of those allegations. Plaintiff admitted the parking policy

3

applied to all seasonal employees, regardless of race. (Nurse Dep., at 58; see also Ex. 5 to Nurse Dep., at 15.) Plaintiff also admitted that all seasonal employees were paid on the same day.[2] (Id. at 71-76.) Next, Plaintiff conceded that Candes Spencer's warning to female employees about bathroom cleanliness was directed at all female seasonal employees. (Id. at 145-46.)

When asked about the other incident with Spencer, Plaintiff provided that Spencer instructed him not to sit next to her that day at work.[3] (Id. at 194.) Plaintiff immediately confronted Spencer by asking if the reason she did not want him to sit next to her was because he was black. (Id. at 194-95.) Spencer responded that she just did not want Plaintiff to sit next to her. (Id.) That seat remained empty for the rest of the shift. (Id. at 195.)

As to the November 28th incident, Plaintiff explained that an unknown white male employee was walking by his desk with metal rods when another white employee, Jacob McNeil, said "you're going to beat our slave? Don't. You know, you can't beat our slave like that." (Id. at 88-89.) The unknown man began swinging the metal rod at Plaintiff's head as if he were whipping a slave. (Id. at 89.) When asked whether the metal rod contacted him, Plaintiff

---

[2] Plaintiff maintained that it was discriminatory for Defendant to require two weeks of work before issuing a paycheck. (See Nurse Dep., at 73.)
[3] The seasonal employees did not have assigned desks and choose a work station at the start of each shift. (Id. at 249.)

4

first equivocated by stating, "[t]he rods didn't — it didn't hit me directly but it scraped me. . . . I don't know if it actually hit me or whatever. . . . I was in such of a shock that I couldn't even comprehend what was happening." (<u>Id.</u> at 89-90.) Later, Plaintiff admitted that the metal rod made no physical contact with him. (<u>Id.</u> at 103-04.)

Plaintiff complained about the incident to Spencer, who reported the events to Defendant's Human Resources Department ("HR"). (<u>Id.</u> at 106-07.) HR investigated the matter by promptly interviewing Plaintiff, McNeil, and other witnesses. (Aff. of Cara Rolen ("Rolen Aff."), Doc. 19-5, ¶ 8.) According to Plaintiff, the investigation could not identify the employee with the metal rods, but Cara Rolen, Defendant's HR Coordinator, indicated it was IT employee Jared Campbell and the metal rods were in fact flexible fiberglass tubes called fish poles used to run cables in the ceiling. (<u>Id.</u> ¶ 9.) Rolen subsequently instructed Campbell not to engage in horseplay in the workplace. (<u>Id.</u> ¶ 10.)

Defendant's investigation concluded that McNeil's actual comments during the incident were: "You're not going to hit anyone with that, are you?" and "Are you going to beat him or whip him?" (<u>Id.</u> ¶¶ 7-8; Aff. of Jacob McNeil ("McNeil Aff."), Doc. 13-4, ¶ 4.) McNeil maintains he never used the word 'slave' or any other

5

racially insensitive term nor did he intend for the statement to be anything but a joke. (McNeil Aff., ¶¶ 6-7.) Furthermore, McNeil did not witness Campbell hit anyone with the rods and never even made "any type of motion with the rod." (Id. ¶ 6.) Plaintiff testified that McNeil later apologized and indicated he was only joking around. (Nurse Dep., at 168.) In fact, Plaintiff revealed that he got along well with McNeil, who was "one of the — the white fellows in there that I felt comfortable around and I didn't feel any racism or anything." (Id. at 249.)

Finally, the parties submit conflicting accounts of what occurred on December 2nd or 3rd between Plaintiff and Will Smith. Plaintiff contends that on December 2nd Defendant's computer system went down so many seasonal employees were visiting websites and playing cards. (Id. at 124.) Will Smith[4] approached Plaintiff and accused him of "printing stuff" in a "real nasty" manner that included "pointing in [Plaintiff's] face like he wanted to fight." (Id. at 126-27.) Another supervisor intervened, but at this point Plaintiff could no longer put up with the "race hating stuff." (Id. at 188.) He said, "I can't do this. . . . [i]t's just not worth it," handed his badge over, and quit. (Id. at 163, 188.)

---

[4] Plaintiff described Will Smith as a "Nazi racist skinhead" because of the "way he looks at you. The way he talks. The way he acts. The tattoos on his arms." (Nurse Dep., at 126.) The tattoo at issue is a web on Smith's elbow and there is no evidence in the record, besides Plaintiff's assumptions, that Smith had any affiliation with Nazis, white supremacists, or similar groups. (See id. at 134-36.)

6

Plaintiff admitted that neither person made physical contact with him, said any racially charged words, or threatened him. (Id. at 183, 188, 199.)

Defendant submits a different version of the incident. The intervening supervisor was Denis Flynn, who submitted an affidavit and copy of an email he sent on December 3rd recounting the events. (Aff. of Denis Flynn ("Flynn Aff."), Doc. 19-3.) According to Flynn's email, on December 3rd, Plaintiff forgot his badge and had to return home to retrieve it before he could start work. (Flynn Aff., Ex. B.) He also forgot his login password for Defendant's computer system, which Will Smith reset for Plaintiff. (Id.) While helping Plaintiff log into the system, Smith reminded Plaintiff not to visit non-work-related websites. (Id.) This comment was prompted by Smith's discovery that Plaintiff had printed coupons[5] on December 2nd, the night before. (Id.) A few minutes after that conversation Plaintiff confronted Smith at his desk and accused Smith of singling him out and being disrespectful. (Id.) Smith and Flynn's attempts to calm Plaintiff down were futile, and Plaintiff threw his badge down and left the office. (Id.) Flynn's email also lists four seasonal employees who

---

[5] The coupons are attached to Flynn's Affidavit as Exhibit A.

witnessed the incident, but there is no evidence in the record from those employees. (Id.)

After the altercation with Smith, Plaintiff did not return to work. (Def.'s SOMF, ¶ 46.) Plaintiff filed a charge with the United States Equal Employment Opportunity Commission ("EEOC"). (Compl., at 5.) The EEOC issued a right to sue notice on July 7, 2017, and Plaintiff filed his complaint and motion to proceed *in forma pauperis* shortly thereafter. (Docs. 1, 2.) Now, Defendant moves for summary judgment on all claims remaining in the case. (Doc. 19.)

## II. LEGAL STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law, and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view factual disputes in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [the non-moving party's] favor."

United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted). The Court should not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Because the standard for summary judgment mirrors that of a directed verdict, the initial burden of proof required by either party depends on who carries the burden of proof at trial. Id. at 323. "When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it 'must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial.'" Four Parcels of Real Prop., 941 F.2d at 1438 (quoting Celotex Corp., 477 U.S. at 331 (Brennan, J., dissenting)). "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" Id. (quoting Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1477 (11th Cir. 1991)).

When the movant does not carry the burden of proof at trial, it may satisfy its initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that

there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp., 477 U.S. 317). The movant cannot meet its initial burden by merely declaring that the non-moving party cannot meet its burden at trial. Id.

If — and only if — the movant carries its initial burden, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. For example, if the movant presented evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993). On the other hand, if the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032,

1033–34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

The Clerk of Court gave Plaintiff timely notice of Defendant's summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 20.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), have been satisfied.

### III. DISCUSSION

Plaintiff alleges claims for racial discrimination and retaliation, but it is unclear exactly what type of discrimination claim he is bringing. (See Compl., at 1.) Consequently, Defendant's motion addresses multiple possible claims including hostile work environment, constructive discharge, disparate treatment, and retaliation.[6] The Court, consistent with its policy of liberally construing *pro se* pleadings,[7] will address each of the four claims.

---

[6] Plaintiff's response brief also does not clarify his claims. He simply restates the entirety of his complaint and maintains there is video evidence of the November 28th incident. (See Doc. 23.)
[7] Haines v. Kerner, 404 U.S. 519, 520–21 (1972).

11

## A. Hostile Work Environment

A hostile work environment claim under Title VII requires an employee to show harassment "sufficiently severe or pervasive to alter the conditions of [his] employment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)). To prevail, the employee must prove the following

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment was based on a protected characteristic of the employee . . . (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

Bryant v. Jones, 575 F.3d 1281, 1296 (11th Cir. 2009) (quoting Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002)).

Turning to the case at hand, most of the allegations of race discrimination are unsupported by the facts. Plaintiff admitted that the alleged discriminatory parking and paycheck policies were in fact uniformly applied to all seasonal employees, regardless of race. (Nurse Dep., at 58, 71-76.) Also, the alleged discrimination by Candes Spencer regarding the women's restroom was not racially motivated. (Id. at 145-46.) Thus, these three allegations should not be considered in Plaintiff's hostile work environment claim because these actions were not motivated by

discrimination against a protected characteristic. See Archibald v. United Parcel Serv. Co. Inc., 620 F. App'x 836, 839 (11th Cir. 2015) (the plaintiff must link the alleged harassment to a protected characteristic).

Plaintiff emphasized in his deposition that although these policies were applied uniformly among seasonal employees, the majority of those employees were minorities, primarily African-American. (See Nurse Dep., at 74, 146.) Plaintiff, however, has neither alleged nor argued he is bringing a disparate impact claim and the Magistrate Judge did not sanction such a claim. (See Report & Recommendation, at 5.) Moreover, at least some of the seasonal employees were white and were required to follow the same parking and paycheck rules as Plaintiff.

Further, there is little evidence to show that the December 3rd incident with Will Smith was motivated by race discrimination. Plaintiff admitted that Smith never made any racially charged statements or physically threatened him. (Nurse Dep., at 183, 188, 199.) Instead, Plaintiff simply perceived the confrontation as racially motivated. (Id. at 188.) Similarly, the incident where Candes Spencer asked Plaintiff not to sit next to her lacks any evidence of racial animosity. Plaintiff even asked Spencer if her reason was because of his race, but Spencer simply responded that she did not want Plaintiff next to her. (Id. at 194-95.)

13

Plaintiff relies on the way others looked at him and the differences between how Defendant's white employees acted and how other white people acted towards black people to support his conclusion that these incidents were racially motivated and created a hostile environment. (See id. at 120-21, 197.) Such subjective beliefs, however, are insufficient to survive summary judgment on a hostile work environment claim. See Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999) (hostile work environment claim requires a plaintiff to show he subjectively perceived the conduct to be hostile and a reasonable person would objectively find the conduct hostile); see also Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1318 (11th Cir. 2011) ("Unreliable conjecture . . . presented as a 'belief' without any basis in ascertainable fact, was not the type of admissible evidence required to survive a motion for summary judgment.").

Thus, at bottom, the only evidence Plaintiff has to show a hostile work environment is the November 28th incident. To determine whether harassment objectively altered an employee's terms or conditions of employment, courts use four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct

14

unreasonably interferes with the employee's job performance." Mendoza, 195 F.3d at 1246.

Viewing the facts in the light most favorable to Plaintiff, the November 28th incident did not alter the terms and conditions of Plaintiff's employment. Even assuming Jacob McNeil used the word 'slave' and Jared Campbell swung the fish poles at Plaintiff, which contradicts the affidavits of McNeil, Rolen, and Spencer, one incident is insufficient to alter Plaintiff's employment. See id. at 1249 (finding that five incidents over an eleventh month period were too infrequent to alter conditions of employment).

Further, McNeil's comment, in light of his later explanation to Plaintiff that he was only joking, is more appropriately categorized as an offensive utterance rather than conduct that is physically threatening or humiliating. See Barrow v. Ga. Pac. Corp., 144 F. App'x 54, 57-58 (11th Cir. 2005) (finding supervisors' use of inflammatory racial slurs on at least five occasions and threats of violence for looking at "that white girl," as well as displays of the rebel flag, the letters "KKK," and a noose did not show "that the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment." (internal quotations omitted)). Although there are severe negative connotations to using the word

15

'slave' in this context, Title VII is not a "general civility code" that imposes liability for every offensive remark. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (noting "sporadic use of abusive language" and "occasional teasing" are not the type of conduct that alters the terms and conditions of employment). While swinging the fiberglass rods at Plaintiff would be physically threatening, Plaintiff admitted the rods never made contact with him.

In short, the November 28th incident did not alter the terms and conditions of Plaintiff's employment. Accordingly, to the extent that Plaintiff brings a cause of action for hostile work environment, he has failed to create a genuine issue of fact, and Defendant is entitled to summary judgment on that claim.

**B. Constructive Discharge**

Constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced to resign involuntarily. Bryant, 575 F.3d at 1298. To prevail, a plaintiff must prove "the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." Id. (quoting Virgo v. Riviera Beach Assoc., Ltd., 30 F.3d 1350, 1363 (11th Cir. 1994)). Establishing a claim for constructive discharge "is a more onerous task than establishing a hostile work

16

environment claim" because the plaintiff must show a greater severity or pervasiveness of harassment. Id. at 1298-99 (citing Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir. 1992)).

Plaintiff lacks the evidence required to support a claim for constructive discharge. Because Plaintiff did not present sufficient evidence to support a hostile work environment claim, he has necessarily failed to meet the higher standard required for a constructive discharge claim. See Cheatham v. DeKalb Cnty., Ga., 682 F. App'x 881, 890 n.8 (11th Cir. 2017); Stancombe v. New Process Steel LP, 652 F. App'x 729, 737 (11th Cir. 2016). Accordingly, Defendant is entitled to summary judgment on any claim of constructive discharge made by Plaintiff.

## C. Disparate Treatment and Retaliation

Title VII prohibits employers from discriminating on the basis of an employee's race. 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove discrimination with direct or circumstantial evidence. Harris v. Shelby Cnty. Bd. of Educ., 99 F.3d 1078, 1082-83 (11th Cir. 1996). For claims supported by circumstantial evidence, courts employ the burden-shifting framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, the plaintiff must establish a prima facie case of discrimination by showing: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated

17

similarly situated employees of other races more favorably; and (4) he was qualified to do the job. McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008). Once the plaintiff satisfies those elements the burden shifts to the employer to provide "a legitimate, nondiscriminatory reason for their action." Id. (citing Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006)). If the employer carries that burden, the plaintiff must then prove that the employer's reasons are pretextual. Id.; see also EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000) (providing comprehensive overview of Title VII discrimination claims).

To prove he suffered an adverse employment action, "an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original). A serious and material change includes, for example, "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). Furthermore, the employee's subjective view of the significance of the employer's action is not dispositive, "the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Davis, 245 F.3d at 1239.

In this case, Plaintiff does not allege nor is there any evidence to show, that he suffered an adverse employment action. Plaintiff was not fired, passed over for promotion,[8] reassigned with significantly different responsibilities, or subjected to a significant change in benefits. In fact, Plaintiff admitted that he quit the job. (Nurse Dep., at 163.) Although Plaintiff was reprimanded by Will Smith and arguably by Candes Spencer, verbal reprimands or criticisms of an employee's job performance "will rarely form" an adverse employment action, unless it leads to "tangible job consequences." Davis, 245 F.3d at 1241-42 (collecting cases of what constitutes an adverse employment action). Further, while Plaintiff undoubtedly believes that the admonishment by Smith constituted a material change in the conditions of his employment, as evidenced by his abrupt decision to quit, such subjective belief "is not controlling." Id. at 1239.

Because Plaintiff has no evidence to create a genuine issue of material fact on whether he suffered an adverse employment action, he cannot make out a discrimination claim under Title VII. Similarly, the inability to create a factual issue on the adverse employment action element precludes Plaintiff's retaliation claim. Id. (adverse action is necessary element of a retaliation claim

---

[8] To the extent that Plaintiff could argue failure to promote, that argument must fail. Plaintiff was hired to perform only seasonal work, which would have lasted, at most, six months. (See Def.'s SOMF, ¶¶ 10-12.)

19

under Title VII) (citing <u>Bass v. Bd. of Cnty. Comm'rs</u>, 242 F.3d 996, 1013-15 (11th Cir. 2001)). Finally, having found that none of Plaintiff's possible claims can survive summary judgment, it is inappropriate for punitive damages to be awarded, and Defendant is entitled to summary judgment on that claim as well.

### IV. CONCLUSION

To the extent that Plaintiff makes a claim for hostile work environment, constructive discharge, race discrimination, and retaliation under Title VII, he has not presented evidence to preclude summary judgment on any of those claims. Accordingly, Defendant's motion for summary judgment (Doc. 19) is **GRANTED**. The Clerk shall **ENTER JUDGMENT** for Defendant. The Clerk is further directed to **TERMINATE** all deadlines and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this ___11th___ day of March, 2019.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA